A.P. v. Pearland Independent School District A.P. v. Pearland Independent School District Your Honors, my client is a student who has been diagnosed with a disability, a specific learning disability, who attended Pearland ISD. Pearland ISD failed its obligation under the Individuals with Disabilities Education Act to follow its child-fine duty. The child-fine duty is a statutory duty under 20 U.S.C. 1412 B.3.A. where a school district must locate, identify, and evaluate all students with a known or suspected disability within a reasonable time after they are on notice of facts or behavior likely to indicate a disability. Now, the courts have held that the threshold for suspicion is relatively low. That's from the O.P. v. West Licote case. Because this is not a gatekeeping function, this is an affirmative duty to go find students who have disabilities and get them evaluated. Now, as to my client, we believe there's multiple areas that the district court did not appropriately take a look at. The first is regarding that a teacher actually tried to follow child-fine protocol. Ms. Sammons testified at the hearing that she understood what child-fine was, that it's when you notice a student who's having struggles and think there's something wrong there. I asked her, what do you do when you notice something like that? She said, I go escalate it to somebody. I go talk to an assistant principal. I talk to a counselor. I asked her, did you do that for Arella, this client? She said, yes, I did. And we really think that that is a teacher who tried to follow the child-fine protocol, but the district didn't do anything about it. Now, in particular, with that set of facts, we think that the court should consider the Leanne v. Reisel, the Fifth Circuit precedent that we cited. Because there, the court basically equated that while IDEA doesn't define what reasonable suspicion is, IDEA does at one point say that a school is imputed knowledge if a teacher escalates certain patterns of behavior to supervisory personnel. So we think that's analogous here. And the court there found that it was analogous to the situation to child-fine. So here, while we're not dealing with behavior, we are dealing with a teacher escalating what she saw, a pattern of struggle, a pattern where the student could not do work independently unless the teacher was kind of right on top of her. Are you talking about her junior year in high school? This was actually, I believe, her freshman and her sophomore year in high school, Your Honor, if I'm correct. I thought, okay, then 22 was her freshman year? I believe 21-22 was her freshman year, if I'm correct. No, 20-21? I'll get that for you when I go back to the counsel's table, Your Honor.  Are you referencing the September 2020 exchange between Ms. Sammons and the parent as triggering the child-fine duty? Yes. And so looking at the exchange, it appears that Ms. Sammons is concerned because the student in September 2020, remote learning, first semester from COVID, and so she's doing remote learning, isn't even logging on. And that's the concern. And then it's the mother that responds. She is struggling to understand the material. And the teacher replies, let's talk about it. Was there ever a discussion? There were two interactions with Ms. Sammons. You're referencing the one where the parent emailed Ms. Sammons. But there was later interaction once she did have her in class. She testified that Aurelia could not work independently. She had to be right on top of her to get any work done. And when was that? And that was later that semester because it was the same school year. 2020. That was the 2020-2021 school year after she came back. How many millions of kids had the same problem trying to do remote learning? I think there were quite a few, Your Honor. But there is evidence in the record that she struggled in basically every setting she was ever in when she didn't receive support. She struggled, you know, both when she came back during the 2020-2021 school year and continued when she continued on during the 2021-2022 school year when she was in person the entire time. So, and Your Honor, we don't believe that whether she was disabled really is much of a question anymore. Our expert found that she was in the bottom, you know, less than 1% for processing speed. She has a clear cognitive deficit. She processes information slower than almost any other student. And so she had a disability, Your Honor. It was not merely, you know, just making reasonable grades. Well, Your Honor, there was struggle before, but Dr. Roman explained it like this, is that you'll see an increasing gap as the material. She is a very bright student because a student with a specific learning disability is not disabled across the board. It means that they, you know, have strengths and weaknesses, but that they have a particular area that is difficult. So a specific learning disability will manifest differently than somebody who just has a low IQ. And when the demands increase, as they do in eighth grade and high school, you're going to see a widening gap. Well, the parents asked for a hearing about dyslexia. Yes, and dyslexia is a type of specific learning disability. Well, I'm not aware of that. Yeah. But, I mean, the parents didn't have any idea. Well, sure, and that's why we have to evaluate, and that's why the district has a duty to evaluate what the disability is. And once we did, after the litigation was commenced, go get a private evaluation, it found the disability was there clear as day, Your Honor. And as to Dr. Roman, there's certainly in the record, and the school district points it out, criticism of his opinions, the information that he didn't consider. Do you believe that those criticisms don't really attack the ultimate conclusions that he reaches, or that they're not sufficient to undermine his opinions? A little bit of both, Your Honor. I think how we termed it is when you have a disability that pops this much, you know, blaming it on cultural factors or, you know, saying, well, you didn't do, you know, you didn't crop, whatever. It's missing the forest for the trees. This is a student who unequivocally had a disability. Now, let's go ahead and turn to Dr. Roman, because what the district court found and what the hearing officer found was that, well, basically neither of them questioned Dr. Roman's credentials, neither of them questioned the validity of what he found. They said that, you know, the report lacked educational context and that, you know, IDEA requires some observations by teachers, et cetera, is what they found. Now, I want to point out specifically 34 CFR 300.310C provides that if a student is not in a school environment, then we get those observations from, you know, in the appropriate environment. Well, this student, when that test was done, was in the home environment taking school online. So getting those observations from the parent, who was the one there proctoring that, is the appropriate environment. And, you know, getting those observations from the parent, who was essentially in place of a teacher, that's the appropriate person to go to. But when the school district had the opportunity, after they got a copy of Dr. Roman's report, they had a read, which was where they look at the report and review it. They didn't want to do any other testing. They were ready to accept this report. They had a teacher there who had had areola in school, you know, and could have given observations, but they said, you know, well, no, we're just going to reject this because Dr. Roman didn't collect any observations, even though they could have collected it from the teacher they had there. So they were looking to trash the report rather than to support the report, even though they didn't have any, you know, qualms with the report. Their LSSP testified at the hearing that there was nothing she could invalidate the report over. Well, let me just ask, what relief exactly are you asking? This young lady is well past high school graduation. Absolutely, Your Honor. Well, first, I do want to point out that the courts have held that any time compensatory relief is requested, which we have, it prevents a finding of mootness, even if the student has already graduated. But specifically as to the student, since we've gone to the district court with this, and if we, you know, have to go back, the parents have had to, you know, take on about $35,000 worth of private schooling. Now, she did well in that private schooling. They had Dr. Roman's report. They incorporated the support she recommended. And she was able to, you know, graduate. She's college-bound now. So we're very excited about that, that she was able to do that once she got the appropriate support. But we will be asking, you know, their authority to order relief. I'm sorry, Your Honor. What private school did she attend? I'll have to get the name of that. I don't have it in my notes right here.  I was wondering. But, yeah, I can find that for you, Your Honor. So, Your Honor, I do want to return real quickly to the child find issue, though, because the teacher, Ms. Sammons, you know, was not the only indication that they should have followed child find. Additionally, during the eighth grade year, the student received intervention through a program called Response to Intervention, where she was getting individualized support. She succeeded that year. And then as soon as we go to ninth grade, they take that away. They don't give that to her anymore. She starts failing again. And they never tried that again. So when she had support, she was succeeding. When they took it away, she started failing again. That should have been an indicia of a disability. Because RTI is different than special education support. RTI, when you go through that program, RTI, the goal is not to continually support a student like you would with a student with a disability. It's to catch them up so that they can then run at the pace of the other students on their own. When she was caught up through RTI, she immediately fell behind when that support got taken away. So that should have been an indicia for Paralim ISD to know, well, we have a student here who RTI support was not sufficient to get them back on level. We need to do the next level. We need to go to special education support. Obviously, the attendance issue also, we've cited numerous precedents. And I certainly want you to look at AP First Pasadena that says that significant concerns with attendance are also a child find issue. So on top of the fact that she's struggling, that she's failing STARS, that she's failing multiple school years, that her parents are bringing concerns to the school, to teachers, and that teachers are escalating concerns to supervisory personnel. On top of all that, you have the attendance problems, which multiple, multiple courts have found that significant attendance issues are also a child find trigger. Now, a lot of those cases concerning absenteeism, there was already some form of diagnosis. And that's not the case here. And it seems that the record contains evidence indicating that on many instances, if not most, when the school reached out to AP's parents about absences, they provided explanations of health-based reasons. Are you saying that the school disregards the parents' explanations and the child find duty is still triggered? I guess I'm saying under AP First Pasadena, they said not to look to the parents to provide explanations for why or why not. You know, this might indicate a disability, that it's unpermissibly shifting the child find burden, which is the affirmative duty of the school district, to the parent. It's on the district to make that determination. Now, one very important thing I want to point out as the child find, though, is the district court cited 34 CFR 30309B, which requires an IEP team to determine whether a student received appropriate instruction. The problem is the district court, and this is a big problem, cited that in the context of child find, which is like two stages before. Because what we do, we have the evaluation, or we have child find, where they determine who gets the evaluation. You have the evaluation. Then you create an IEP team to review the evaluation. And then you consider the factor in 34 CFR 300309, whether they received appropriate instruction. The district court moved that all the way up to before the evaluation. So then if the school district does that, then they're really putting the cart before the horse, because they don't have the information they should have from an evaluation. Then they're just kind of getting the shoot from the hip on, well, we don't think that that student needs to be evaluated. That's not how it works. We find the students who have a suspected disability. We evaluate them. We review that evaluation, and then we consider the factor from 34 CFR 300309. So that very much needs to get corrected. Your Honor, we certainly believe that on that basis. Also, I want to bring out that the district didn't provide the HB 4545 instruction, which was a requirement. Anytime a student fails a STAR, they're supposed to provide intervention. They're also supposed to create a committee for students Arella's age to determine why is she failing a STAR. That was another opportunity for child find that they missed, because they didn't create that committee. They didn't provide that intervention. They could have seen there on top of that. There's four or five levels of where they could have found reasonable suspicion of a disability that they missed. So we certainly believe you should reverse this to child find. We believe you should reverse as to eligibility, because Roman did collect educational data context from the appropriate environment, which is what 34 CFR 300310 says to do when a student is out of school. Her appropriate environment was her home classroom. And the record reflects that he got information from that classroom. So because we're asking you to reverse on the child find issue and on the eligibility issue, we obviously believe that, you know, if a child was, as we cited, anytime a child is, you know, under the Fifth Circuit case D.C. v. Klein, well, actually, that was the district court level of the case, but it was affirmed by the Fifth Circuit. Anytime there's, you know, a child is denied child find when they should have been eligible, it's an egregious loss of educational opportunity. And so we do believe you should find that there was a denial of a free appropriate public education. Thank you. Okay. You have a chance for rebuttal. Thank you, Your Honor. All right. Thank you. Ms. Yock. May it please the Court. Kendra Yock on behalf of Appalachia Paralind Independent School District. There are two issues before the Court today. The first is child find, whether the student should have been referred for special education evaluation sooner. And the second is eligibility, whether the facts actually establish that the student is a student with a disability in need of specialized instruction and related services. As the hearing officer and the district court correctly found, the answer to both questions is no. I'd like to discuss two main points with respect to child find. The first is that the school was reasonable in not suspecting a disability in need for specialized instruction, despite the student's numerous absences and failing grades. The second is that appellant's arguments with respect to Ms. Salmon's testimony, as well as the allegation of allegedly deficient school efforts to support the students, misrepresent the record and are not availing. With respect to eligibility, the district court correctly concluded that Dr. Roman's evaluation lacked components required by the IDEA, which are important to provide educational context and needed to determine whether the student, in fact, needs special education. Petitioner's argument that the information collected from the student's mother was adequate to satisfy those requirements is contradicted by the evidence in the record. I would actually like to start with the question of eligibility because it's dispositive. As this court held in DG v. Flour Bluff ISD, if the student is not eligible, that ends the inquiry. There would not be a child find violation. To be eligible as a child with a disability, the student must be evaluated in accordance with the regulations and determined to have one of the enumerated disabilities, and because of that disability, need specialized instruction and related services. Now, Dr. Roman diagnosed the student with a specific learning disability in reading comprehension, math calculations and math problem solving. The district does take issue with his methodology and conclusions. However, today I'd like to focus on the second prong, the failure to establish a need for specialized instruction. How do we know if a student needs specialized instruction? We rely on a comprehensive evaluation. The IDEA thus requires assessment in multiple domains and collection of information from multiple sources. As this court has held repeatedly in cases including OP v. Weslaco ISD, DL v. Clear Creek ISD and Alvin ISD v. AD, feedback from teachers and observations of the student's learning behaviors in the educational environment are crucial pieces of information, key to determining whether the student needs specially designed instruction, actual modifications to how that instruction is delivered, or if the student's deficits are due to a lack of appropriate general education instruction in reading and math, which is an exclusionary factor under the statute at section 1414b-5. For all evaluations, the statute directs the team to consider as appropriate information provided by the parents, classroom-based assessments, local assessments and state assessments, classroom-based observations, and observations by teachers. Dr. Roman's report is lacking four of those. There are no current classroom-based assessments, local assessments, observations by teachers, or classroom-based observations. Additionally, to determine eligibility, the team has to draw on information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, information about the student's physical condition and social and cultural background, and adaptive behavior. Dr. Roman's report is also missing those teacher recommendations, information about the student's physical condition and background, and her adaptive behavior in a learning environment. For a specific learning disability, the regulations require even more information to ensure that the student's deficits are not due to a lack of general education instruction. The team has to consider data demonstrating that the student in fact received general education instruction delivered by qualified personnel. Dr. Roman assumed that the student did. He was not aware she was homeschooled during 6th grade. Her attendance started to falter in 7th grade and continued to worsen until she withdrew from the district in the middle of 10th grade. He also didn't have information about the homeschooling program that she was enrolled in after she withdrew. Appellant suggests that he did, in fact, have this information, but when he was asked, did you collect information about the homeschool curriculum and the student's performance? He said, there was some information in the record relevant to the curriculum, but no, the primary answer is that I did not. That's at 1187. Finally, the regulations require the team to consider information from an observation of the student, their academic performance in a regular classroom or an appropriate environment. And counsel is correct. Appropriate environment can be a non-school environment. It can be a private school or a homeschool, or for a student just entering school at 3, a preschool or daycare environment. It can include those things. Dr. Roman's evaluation, however, doesn't involve, doesn't include an observation in her learning environment. It's not enough to ask the parent questions as the parent. We need to ask questions of the parent if she's actually in that instructional role, in that capacity, or if she's receiving instruction from an online source or other program from those providers. And in fact, the district's licensed specialist in school psychology, Ms. Jaramenos, said that's exactly what would happen if the school district was doing an evaluation. Ms. Yoke, the record appears to contain the information from the 2019-2020 time period, indicating that there were struggles, interventions, that was proved successful, came back, sort of exited intervention, and then struggled again. And then Mr. McKnight references, and I'm not sure if it's in the record, but when AP moves to a private school, that they adopt some of the recommendations by Roman and they appear to work. Is that evidence that we should consider that maybe the opinions that he had about her disabilities may have some validity because the recommendations he suggested appear to have been successful? That later part, Your Honor, is not in the record. At the time of the hearing, she was still engaged in a homeschool program. The earlier information related to 8th grade when she did receive response to intervention, which did support her and enabled her to receive passing grades despite her attendance starting to fall off. In addition to the change from having RTI to not having it between 8th and 9th grade, this is COVID. The last part of her 8th grade year becomes remote suddenly. She starts 9th grade remotely. Additionally, she's taking a very rigorous course load in high school. She moves from a schedule where she has every class every day to a block schedule where the courses are twice as long and only meet every other day, and her attendance gets even worse. In 8th grade, it wasn't great. In 9th grade, it's quite bad. She's missing the instruction. She's missing the in-class assignments, and she's missing instruction on how to do the homework assignments, which all compounds. That's the more important change when we go to 9th grade. Is she in person or absent then? I mean online. She began 9th grade online. The counselor met with the parent, I believe it was in November, and said, we really need to get her back in person. Okay. That's correct. With respect to the parent serving as the teacher, Dr. Roman said that he had the parent fill out rating scales as the parent. When it was suggested that she also complete them in her role as teacher, he scoffed at this. He said, I can't even imagine at 1854. And there's no testimony that she was serving in the role as an instructor. In fact, the student explained that initially she was in an online program. When that was not successful, she switched to a different program that involved videos and workbooks. Dr. Roman himself acknowledged multiple times that he's doing a clinical evaluation. He's collecting data from formal testing, and other components that are required by the IDEA fall to the ARD committee to collect and consider. For instance, he says at 1110, there are certain things that are required by law that are not my responsibility. There are things that fall to the ARD committee. At 1851, he says it's not his job to check all the boxes the school checks. And at 1878, the ARD committee would collect background information so it doesn't need to be in his report. And he's correct. In a typical circumstance, the school district would collect that information. They would do their own evaluation. But in this circumstance, an evaluation was offered, and the parents did not consent to the evaluation. Now, Appellant has argued that the components that are missing are technical, they're not really needed here. But that approach is not supported by the text of the IDEA and regulations or by this court's precedent. For instance, in Perez v. Wislocko, the court found that the findings of the school district were more persuasive than that of the private report that lacked the educational context. Similarly, in D.L. v. Clear Creek and Alvin ISD v. A.D. Additionally, the Western District of Texas in R.B. v. Northeast has a similar case where there's only a private report and the school district had not evaluated. And because of the lack of information about the student's actual performance when being provided instruction, it's not possible to determine whether the student needs modifications to that instruction, an actual specialized instruction. What do we see when we do consider that context, the context that is available from the school district? Although Dr. Roman identified significant deficits in mathematics, the student passed the STAR exam in math in fourth and fifth grade. She was only one point away from passing the Algebra STAR at the end of ninth grade. She passed Algebra during summer school. Her teachers testified that there was a math exam at the beginning of the chemistry class to make sure the students had requisite skills, and she passed that test being able to solve equations and use exponents. With respect to the reading deficits, the student passed the STAR exam in third, fourth, and fifth grade. Note she didn't take it in sixth grade. She was not successful in seventh, and in eighth grade was COVID, so it was not administered. She was also absent in ninth grade when it was administered. However, a practice or a release STAR exam was given at the beginning of tenth grade and the middle of year in tenth grade, and she was successful on both of those exams. Her teachers also testified she was able to read and answer questions from high school-level text. She was able to write an average essay and was generally performing on grade level when she was present. Dr. Roman didn't have that information, and so he didn't consider it. So his conclusions should be discounted because he lacked that information to consider. When we do look at that context available, we can see that she does not need specialized instruction. She needs consistent general education instruction. Accordingly, the evidence does not establish eligibility. And as I said, as the court has held in Wislako and Flair Bluff, there's no penalty for not timely evaluating a student who does not need special education. That said, I will turn to the issue of child find. Child find is triggered when we have both a suspicion of a disability and that because of that disability, the student needs specialized instruction. In this case, there was not reason to suspect a disability and need for special education, and in fact, the opposite was true. Yes, the student had failing grades and numerous absences, which can indicate a disability. But there's good reason that this court has said not every student who's struggling academically or behaviorally needs to be referred for special education. That's in Ashley G. v. Copper's Cove and Leon H. v. Riesel ISD. This is because there are multiple factors that could contribute to a student's poor grades or attendance or behavior that are not a disability, and we need to take a more holistic view. The district court's factual finding that the district did not have a suspicion of a disability is clearly supported by the record. This is because there's a clear line connecting the student's poor grades to her poor attendance. All of the witnesses testified that if students not in school to receive instruction, their learning and performance will suffer. And then we have a clear line from the absences to the reasons provided by the parents, which are not related to her education. They're not related to a potential disability. The case is cited by appellant related to attendance being part of a red flag for child find. It's one piece of the puzzle. And as Judge Rodriguez said, in those cases there was also knowledge of a diagnosis, a medical or mental health impairment that was then impacting the student's attendance and performance at school. That's absent here. We have no knowledge of any diagnosis of the student. There's one case where that was not true. That's Malloy v. D.C. But in that case, the absences were unexplained. They were unexcused. The school didn't know why is the student missing. And when the student was in school, they did observe signs of a disability. And that triggered child find. But that's also not present here. We do know why the student was in school. Her family was traveling or she had menstrual cramps. These are not indications of a disability. How do we consider the information from the fall of 2020? There certainly is the exchange, the e-mail exchange that we've discussed. And then later in the fall, there are additional struggles. And there's an actual meeting. What type of intervention actually occurred? And why did that not constitute some grounds to suspect that at least in analysis, the child find duty should have been triggered? Sure. So that initial e-mail with Ms. Sammons was September of ninth grade. Ms. Sammons actually initiated the outreach to the parents saying, I'm concerned the student's not signing on to class. And she hasn't opened her online textbook yet. Right? So mom says she's struggling. And the teacher says, I understand why she's struggling. She hasn't been here. And she hasn't looked at her textbook. But I want to help her. Right? And she says, please have the student reach out to me. Ms. Sammons testified she reached out to the student and didn't get a response from the student at that time. There are other times once the student was back in school where Ms. Sammons would meet with her and work with her directly to try and get caught up on the work that she had missed. With respect to her specific statement about raising her concerns with the counselor and the assistant principal, she was asked a follow-up question. Why did you go to the counselor and assistant principal? And she said she doesn't want her students to fail. She was concerned that the student wasn't attending. She didn't know where the student was. She did not say she had concerns about learning. Additionally, she explained that she does understand that if she has concerns about learning and thinks the student needs to be tested, she goes to this fed department, the special education department, to ask for that testing, which she did not do here. And, in fact, her testimony goes on. She's asked, well, did you suspect she might have a disability? And Ms. Sammons says no and asks, why didn't you think that might be a possibility? She said, well, when I would work with her, she could do the work. She could answer the question. She was on top of it. And that exact quote is used by the district court to support the position that the teachers were reasonable in not suspecting a disability. So it's our position that Ms. Sammons did not suspect a disability or intend to make a referral because when she worked with a student, she saw that she was a capable student. She was able to do the work. It's just that a lot of the time she wasn't present to get that work done. And in terms of the additional support that Ms. Sammons provided, could that also be read as indicating that there is a disability that requires support and that it was successful and, as a result, the school district should have looked further into that? It's a good question. Ms. Sammons was asked, you know, when you worked with her, did you have to break down the concepts or repeat the instruction? And she said, no, I just needed to be nearby, right? She just had to be there. And so I think that is fairly typical high school behavior, that students get more work done when they know they're being watched, and so not a reason for Ms. Sammons to suspect a disability or make a referral. And the hearing officer found child fine not triggered until September of 22. That's correct, and that's an important point. The hearing officer who heard Ms. Sammons' testimony directly and is in the best position to make a credibility determination, as the court said in Lisa M. v. Leander, did not find that Ms. Sammons suspected a disability or tried to make a referral. She found that child fine was not triggered until the due process complaint was filed. That's correct. I do want to briefly address that the district understands that it is the duty of the school district to identify students who may need specialized instruction because of a disability, as this court found in Krawitz v. Galveston, but that has to be done based on the information available to it. And as we've discussed, the teacher's observations of the student when she did come to class were that she was an average student, she was a capable learner, not that she needed some sort of specialized instruction. The student, when she was asked, right, because the teacher sees she's not coming and that she's failing, they talked to her, and she says, yep, I'm working on catching up. She doesn't say it's too hard. Similarly, there's multiple outreach to the parents. There are e-mails and phone calls from the teachers, from the counselor and the assistant principal, and they don't say she's struggling or she's not coming to school. This is really a little unusual compared to many of the cases we've heard, right? I mean, you don't normally have some kid, although many kids do go up and down in their performance, you don't have the parents come and say, this child must have needed special education when the child is actually able to do the classes. We don't see many cases like that. No, typically our cases, the student does have a diagnosed disability, and the question is, did the district respond appropriately to that knowledge? And we don't have that here, right? Here we have a student who was capable of learning when she got general education instruction, but when she's absent, just like any other student, whether they have a disability or not, they're not going to be able to maintain passant grades. If there are no further questions, I would ask the Court to affirm. Thank you. Thank you. Okay, Mr. McKnight. So, Your Honor, I believe you identified that really in the record, the only times we see, you know, success, academic success from the student is when we're talking about extra intervention. We see it in the 8th grade year when she's getting that response to intervention support in math and reading, she does well there. We see what Ms. Salmon says, you know, when she's working independently, she can't do the work, but then when she's, you know, with her, supporting her, she can do it. You've heard, you know, now, once she got that support, she's doing well. Any time she's not getting direct intervention, she's falling behind, she's failing, and failing badly. They're calling her an average student. I mean, she failed every core class of high school for two years. That's not what happened, Your Honor. And then she made them up. Ultimately, once she got the support recommended by Dr. Roman in private school, which that was the Xavier Academy, Your Honor. OK. Xavier Educational Academy. Now, I wanted to go back to where she started with Dr. Roman. First, she cited, you know, the need for classroom-based assessment and observations. I know I cited to you, you know, in the briefing, that there's case law that basically says child find is available to students who are at home. It's available to students who are in private schools. It's available to students who are being home-schooled. So even when there is not a classroom environment, child find has to still be available. They got assessments, you know, from the parent, from that classroom, as appropriate. Now 34 CFR 300 310C, like I cited to you, says that when they're not in school, then you get it from the appropriate environment. Dr. Roman at AR 1145, 715, testified as to, you know, kind of the observations that the parent gave from that environment that he, you know, considered when he created his report. Now the district also cites the, you know, things like vision, hearing, social, and emotional data that has to be collected for one. That statute, 34 CFR 300 304 and 300 305, that references those, says that data is only collected if appropriate. So it's not the, you know, the hurdle, the absolute requirement they're making out to be. Second, that data can be, could have been collected as part of the school's read after they reviewed Dr. Roman's evaluation. Dr. Roman's evaluation did not have to be all and all. If they found that it was deficient in any way, they had the opportunity to collect that data. They had people there who knew the student. They had the student's educational records. They could have supported the record. They refused to do that. You also have Dr. Roman's testimony from AR 1853 that he did consider whether there were emotional, social, or behavior factors, and that he determined that those were not, you know, factors that were, you know, limiting her, you know, from being identified with a disability. That she absolutely, the testing was clear. And notice, you don't see the school district denying that she has a specific learning disability. They're not questioning his data. They're not questioning his findings. They did that at the administrative level. They lost on that issue at the administrative level. The findings are valid. She has a disability. The question is, I mean, did the school district have enough information to do, you know, to find that through child find? And they absolutely did. They had it because... When? When? What I proposed in my briefing was at the end of, well, their testimony from their expert says that when she failed that Algebra 1 star after a year of failing classes, that should have raised red flags. So that would have been May 2021, Your Honor. Or I guess they would have got the results in June 2021. So there's about a 17-month gap between May 2021 and September, or October 2022 when they finally satisfied the child find. Now, as I stated in my briefing, that's the latest. I think it could be earlier in the 2020-2021 school year, but I'll give you the... You're supposed to make a finding about that. At the school? No, on appeal here. On appeal. Well, yes, Your Honor, I believe you are. I believe you should reverse the district court as the child find, make a finding that the district did have reason to suspect a disability based on everything we've presented to you, based on Ms. Samets, based on the fact that they saw she failed without intervention after succeeding with intervention, based on all the case law, which there hasn't been any... Is there any child that you know of who wouldn't do better if they had one-on-one support while they were studying? Your Honor... There are a few. Yes, in fact, I mean, you know, one of the main principles of special education is we want students to operate in the least restrictive environment. So if they don't need support, it can be bad for them because they've become dependent on that support. So if a student is capable of operating independently, we want that student to operate independently. But I believe Arella demonstrated that she was not able to ever operate independently. The only time in the record we have her succeeding academically. She still has the absences in 8th grade that they're trying to blame it on. She still has quite a few. But when she got that individualized support, she succeeded in the 8th grade when it was taken away in the 9th and 10th. But again, that's not quite my question. I was just more or less a rhetorical question. Sure, well... I mean, many of the great intellectuals of Western history had private tutors when they were young. Sure. Anybody would benefit from a private... I agree, anybody would benefit, but, Your Honor, I believe she needed it to receive a free, appropriate public education because she would have failed without it. And what type of intervention... She did fail without it. ...triggers the child-fine, as I think has been expressed, most students would do better when there's a teacher right next to them. If that's what's required for the student to do better, that doesn't necessarily indicate that the child has a disability. Well, but it's a reason to suspect one, which is all... That would trigger child-fine obligations, from your view? If a student is incapable of working independently and has to have individualized support, because that's what we're looking for here, a need for individualized support. If the student has to have individualized support to have academic success, then absolutely, I would say, yes, that triggers a reasonable suspicion of a disability. At least a suspicion. Again, we're not saying that they have to make a determination right away, a priority, that she has a disability, but they are supposed to evaluate for one. And that's what the child-fine trigger's about. Let's go have that evaluation. And so they never did the evaluation in a reasonable time, Your Honour. All right, thank you. We have your case. Thank you. Court will be in recess until tomorrow morning at 9am.